**Opinion issued June 29, 2021**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00626-CV

————————————

**HOUSTON COMMUNITY COLLEGE, Appellant**

**V.**

**SABRINA LEWIS, Appellee**

---

**On Appeal from the 269th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-77438**

---

## MEMORANDUM OPINION

Appellant Houston Community College appeals the trial court's denial of its plea to the jurisdiction. In nine issues, Houston Community College argues the trial court erred by denying its plea on appellee Dr. Sabrina Lewis' retaliation claim under the Texas Whistleblower Act and her race discrimination claim. We reverse the trial

court's order denying HCC's plea to the jurisdiction and render judgment dismissing Dr. Lewis' claims against HCC for lack of jurisdiction.

**Background**

Houston Community College ("HCC") is an institution of higher education created and organized under Chapter 130 of the Texas Education Code. Dr. Sabrina Lewis ("Dr. Lewis"), an African American woman, holds a Bachelor of Science in business with a minor in accounting, a Master of Business Administration, and a Doctor of Management in Organizational Leadership. In 2009, HCC hired Dr. Lewis as the Director of HCC's Veterans Affairs Department (the "VA Department"). At that time, Dr. Lewis' immediate supervisor was HCC's Associate Vice Chancellor of Student Services, Dr. Cheryl Sterling ("Dr. Sterling"), also African American. As Director of the VA Department, Dr. Lewis was responsible for promoting the enrollment, retention, and graduation of veteran students, providing effective leadership for the department, and serving as HCC's primary contact with the Texas Veterans Commission and the U.S. Department of Veterans Affairs.

In August 2014, Dr. Lewis filed a complaint of discrimination against Dr. Sterling alleging she had created a hostile work environment and further that she was harassing, bullying, and intimidating Dr. Lewis. Dr. Lewis requested that HCC change her reporting structure to allow her to bypass Dr. Sterling and report directly

to Dr. Diana Pino, HCC's Vice Chancellor of Student Services. On August 24, 2014, HCC's Human Resources Department ("HR") rejected Dr. Lewis' complaint as untimely and for failure to comply with HCC's complaint procedure.

In September 2014, Dr. Sterling, who was still Dr. Lewis' direct supervisor, placed Dr. Lewis on a ninety-day "Employee Corrective Action and Performance Improvement Plan" ("PIP"). Sterling observed, among other things, that VA Department employees were performing poorly under Dr. Lewis' leadership, that several employees had previously met with Dr. Sterling to discuss "internal inequities" existing within the VA Department, and that Dr. Lewis had a high turnover of staff. In the PIP, Dr. Sterling identified several areas of improvement for Dr. Lewis to meet, including (1) developing "a system that addresses fair hiring practices and diversity," (2) developing "employee relations that promote[] internal equity," (3) developing "a team approach with staff that warrants shared governance in fairness and equity," (4) developing "modalities that will address excellent customer services to staff and students," (5) establishing "a customer services mechanism that is conducive to staff and students in the VA department," and (6) providing "leadership that does not create a hostile environment but engenders empowerment that motivates all staff and students[.]" Dr. Sterling warned Dr. Lewis that failure to improve in the noted areas could "result in further disciplinary action or termination of employment." Dr. Lewis disagreed with the PIP and claimed that

3

the allegations raised against her were demonstrably false. She alleges that she successfully completed the PIP in December 2014.

In April 2015, HCC's then-interim Vice Chancellor of Student Services, Dr. Irene Porcarello ("Dr. Porcarello"),[1] temporarily changed Dr. Lewis' immediate supervisor from Dr. Sterling to Dr. Parvin Bagherpour ("Dr. Bagherpour"). Dr. Porcarello directed Dr. Bagherpour, HCC's Associate Vice Chancellor of International Student Services, to serve as Dr. Lewis' "mentor and coach," and to work collaboratively with Dr. Lewis to help improve six aspects of the VA Department: (1) staff training; (2) preparation of internal and external audits; (3) addressing department HR challenges; (4) planning and implementation of college-wide activities; (5) participation in ongoing management meetings; and (6) other business processes. The temporary assignment began on April 27, 2015 and was expected to conclude on August 31, 2015. Dr. Porcarello stated that she, Dr. Bagherpour, Dr. Lewis, and Satrice Morris ("Morris"), an HCC Senior HR Specialist, would meet to review and discuss "the level of progress and reporting protocols of the Veterans Affairs/Student Support" during the first week of August 2015.

---

[1] Dr. Porcarello replaced Dr. Diana Pino as Vice Chancellor of Student Services in March 2015.

Dr. Lewis claims she was concerned about the temporary reassignment because two years prior, in September 2013, she and others had received an email claiming Dr. Bagherpour had allegedly mistreated her African American staff.[2] According to Dr. Lewis, Dr. Bagherpour undermined her authority as Director of the VA Department and precluded her from making employment decisions necessary to improve. Dr. Lewis claims that Dr. Porcarello also excluded her from critical work meetings. There is no evidence in the record, however, that Dr. Lewis ever filed a complaint against Dr. Bagherpour or Dr. Porcarello, or that Dr. Lewis ever reported such alleged mistreatment.

On July 22, 2015, Lucrecia Hembree ("Hembree"), a Hispanic employee in the VA Department, filed a formal complaint against Dr. Lewis with HCC's Office of Institutional Equity ("OIE"). Hembree alleged that Dr. Lewis had discriminated and retaliated against her, in part, by implementing an "English only" rule in February 2015.[3] David Madison Thornton ("Thornton"), an African American OIE investigator at HCC, investigated Hembree's complaints against Dr. Lewis. Thornton interviewed several witnesses and reviewed Dr. Lewis' written response. In her response, Dr. Lewis noted that one of her employees in the VA Department

---

[2] In her brief, Dr. Lewis identifies Dr. Bagherpour as an Iranian woman.

[3] Hembree also claimed that she had been "subjected to retaliation based on a workman's [sic] compensation claim and further subjugated and harassed based on her national origin" in that she "could no longer speak Spanish in the Veterans Affairs Department."

5

had previously used a racial slur by referring to her as a "monkey" in Spanish and that she only implemented the policy after speaking with Morris in HR. According to Dr. Lewis, both Morris and HCC's Employee Relations Director Tom Anderson ("Anderson") approved the "English-only" practice Dr. Lewis implemented after some of her staff members complained that their peers were engaging in loud, personal conversations in Spanish during work time.

After completing his investigation, Thornton submitted a report to David Cross ("Cross"), Director of OIE.[4] In his report, Thornton concluded that Dr. Lewis had (1) engaged in discrimination by prohibiting department employees from speaking any language other than English, and (2) "set the tone and condoned a hostile work environment for [Hembree] and other employees of the Veterans Affairs department."[5] On September 9, 2015, Cross notified Dr. Porcarello that OIE had investigated Hembree's claims and determined that there were facts supporting her claim of discrimination against Dr. Lewis. Cross attached Thornton's investigative report. Dr. Porcarello reviewed the report and accepted OIE's

---

[4]    Dr. Lewis claims that Director Cross was also involved and "in charge" of the investigation.

[5]    With respect to Hembree's allegation of retaliation, Thorton rendered a "no cause finding" concluding that Hembree could not prove a causal connection between engaging in protected activity and an adverse employment action.

findings.[6] At her deposition, Dr. Lewis testified that she did not believe Thornton reached his findings and conclusions because of her race.

On September 15, 2015, Dr. Lewis and Brandi Maynard ("Maynard"), an HCC student who also works as a Student Services Assistant in the VA Department, were involved in a separate incident. According to Dr. Lewis, Maynard has a long history of poor performance and tardiness. Dr. Lewis, who believed Maynard had returned late from lunch on September 15, called Maynard into her office and questioned her about her activities, at which time an altercation ensued.

According to Dr. Lewis, Maynard became defensive and disrespectful. The two women walked to Maynard's cubicle to retrieve a call log, at which time Maynard yelled at Dr. Lewis and allegedly threw or tossed papers in her direction. Maynard then followed Dr. Lewis into her office where Dr. Lewis proceeded to issue Maynard a PIP. Maynard, who did not believe she deserved a PIP, was angry and embarrassed because others in the VA Department could hear their conversation. Dr. Lewis, who contends that she felt threatened by Maynard, called the campus police and had Maynard escorted from the building. Multiple employees in the VA Department witnessed the incident.[7]

---

[6] On September 23, 2015, David Cross notified Dr. Lewis of OIE's findings.

[7] Later that evening, Dr. Lewis contacted the campus police to file an official report to document the incident with Maynard. An officer returned to the VA Department that evening at which time he interviewed Dr. Lewis and took statements from several employees.

7

One witness claimed that "something really set Dr. Lewis off that day. She was in rare form. I've never seen her that angry. She was yelling and it was scary." Another witness, however, placed the blame on Maynard and claimed that Maynard had flown into a "rage" and was yelling at Dr. Lewis and being disrespectful. Witnesses also overheard Dr. Lewis tell Maynard that she was going to call the police and have Maynard removed from the building for being "disrespectful." Specifically, one witness reported that Dr. Lewis told Maynard to "stop yelling and being disrespectful. This is the last time. If you don't stop, I'm going to call the police and have them take you out of here." Another witness overheard Dr. Lewis tell the police dispatcher that she "needed an employee escorted out for being disrespectful." Dr. Lewis told the investigating officers that although Maynard had not expressly threatened to physically harm her or another employee, she nevertheless felt threatened because Maynard was belligerent and had stood over Dr. Lewis while she was sitting at her desk.

Maynard immediately reported the incident to HCC's Human Resources Department and filed a formal complaint. Dr. Lewis reported the incident to Morris in HR the next day. On September 16, 2015, HCC placed Dr. Lewis on administrative leave with pay pending investigation of Maynard's complaint. According to Morris, who investigated the complaint, Maynard was not placed on administrative leave because unlike Dr. Lewis, Maynard had filed a formal

complaint with HR, and the dispute was considered a significant event perpetrated against her by her supervisor, Dr. Lewis. In addition to her responsibilities as Vice Chancellor of International Student Services, Dr. Bagherpour was tasked with performing Dr. Lewis' duties as VA Director while Dr. Lewis remained on administrative leave.

On September 22, 2015, Morris issued a report to Anderson, HCC's Employee Relations Director, concluding that Maynard had acted inappropriately and disrespectfully towards Dr. Lewis. Morris recommended that Maynard be placed on a thirty-day PIP. Morris also concluded that Dr. Lewis had acted inappropriately and recommended that Dr. Lewis be removed as Director of the VA Department "due to her poor leadership and management practices, treatment of employees and other related performance concerns that were not addressed in the investigation of the incident on September 15, 2015." During her deposition, Dr. Lewis testified that she did not believe Morris recommended her removal as director because of her race.

On September 24, 2015, Dr. Bagherpour also issued a report to Anderson addressing the six areas of improvement Dr. Porcarello had identified in April 2015 as requiring improvement from Dr. Lewis. Dr. Bagherpour identified several performance failures and behavioral issues involving Dr. Lewis, including poor student service and business handling, borderline insubordination such as raising her

9

voice on several occasions at Dr. Bagherpour, and failure to follow directives. Dr. Bagherpour concluded that Dr. Lewis had continuously "demonstrated poor management, leadership and communication skills with the employees reporting to her" and "demonstrated inappropriate behavior and used poor judgment on the daily operations and management of the department." She recommended that Dr. Lewis be terminated from HCC based "on the findings and conclusions" presented in her report and the report Morris previously prepared. Dr. Porcarello approved the report and recommendation. Dr. Bagherpour testified during her deposition that she wanted to recommend a form of "corrective action" rather than termination, but that Dr. Porcarello insisted upon recommending termination.

Anderson reviewed the recommendations of Dr. Bagherpour and Morris and conducted an independent review of the information provided in their reports. Based on his independent review, Anderson determined that Dr. Lewis' "performance problems were significant, constituted serious violations of HCC policy, and warranted the termination of her employment from HCC." Anderson prepared a memorandum to HCC's Chancellor, Dr. Cesar Maldonado ("Dr. Maldonado"), dated September 24, 2015, recommending Dr. Lewis' termination based on serious performance problems, including mismanagement, unprofessional behavior, and the OIE's finding that Dr. Lewis had engaged in discrimination. Anderson attached a copy of the reports prepared by Dr. Bagherpour and Morris to his recommendation.

10

Separately, on September 25, 2015, Dr. Maldonado, Dr. Kim Beatty ("Beatty"), Vice Chancellor of Instructional Services/Chief Academic Officer, Dr. Porcarello, and Terri Zamora ("Zamora"), Senior Vice Chancellor for Finance & Administration, received a letter, via email, from Dr. Lewis' counsel informing HCC that she was representing Dr. Lewis in connection with her administrative leave and attaching Dr. Lewis' rebuttal to Maynard's complaint. In her rebuttal, Dr. Lewis detailed Maynard's past job performance issues, including other instances of insubordination. According to Dr. Lewis, Maynard became angry, argumentative, and acted disrespectfully towards her when Dr. Lewis issued Maynard a PIP on September 15, 2015—the same day campus police escorted Maynard out the building. Dr. Lewis stated that she called the campus police because she felt threatened by Maynard's increasingly belligerent behavior. Dr. Lewis also stated that in December 2014, she discovered that a Veteran's Award had been placed on Maynard's student account to cover her tuition and fees for the Spring 2012 and Fall 2013 semesters, even though Maynard was not a military veteran or otherwise entitled to such benefit. Dr. Lewis stated that she had reported the alleged misconduct to several HCC officials but "[u]pon information and belief, nothing [had] been done to address this matter."

On October 1, 2015, after reviewing the reports and recommendations provided by Anderson, Dr. Maldonado approved Dr. Lewis' termination. A few

11

days later, on October 5, 2015, Dr. Lewis and her attorney attended a meeting with Dr. Bagherpour and Morris. Dr. Bagherpour handed Dr. Lewis a termination letter and notified her that HCC was terminating her employment. Dr. Lewis contends that her attorney asked if there was "a grievance process" and "an appeals process," and that Morris responded, "no."

After HCC terminated Dr. Lewis, Dr. Bagherpour continued to perform Dr. Lewis' duties until HCC named Dr. Cephas Archie ("Dr. Archie"), an African American male, as the interim Director of the VA Department in mid to late October 2015. A few months later, HCC hired Dr. Leon Grissett, also African American, as the VA Department's permanent director.

In December 2015, Dr. Lewis filed suit against HCC alleging that HCC had terminated her employment in retaliation for reporting a violation of law in violation of the Texas Whistleblower Act (the "Whistleblower Act"). Specifically, Dr. Lewis contends that, in December 2014, Nandy Baldonado ("Baldonado"), HCC's Director of Student Financial Services & Cashiering Operations, informed her that a "veteran's award" had been placed on Maynard's student account to cover her tuition and fees for the Spring 2012 and Fall 2013 semesters. To indicate eligibility for such an award, HCC places a "B-Code" on a student's account, which allows the student to continue attending classes without disruption until HCC receives tuition and fees from the U.S. Department of Veteran Affairs ("USVA"). Dr. Lewis

12

contends only post-9/11 military veterans or their dependents are eligible to receive such benefits.

After Dr. Lewis verified that a B-code had been placed on Maynard's student account despite not being a veteran, Dr. Lewis contacted the Texas Veterans Commission ("TVC") and USVA to address the issue in December 2014 or January 2015. Dr. Lewis contends that in December 2014, she informed her then-supervisor, Dr. Sterling, of the B-Code misuse. Dr. Lewis claims she also told Morris about the B-Code issue in February 2015, and Dr. Bagherpour and Dr. Porcarello in April 2015. She also told three of HCC's internal auditors about her concerns regarding the B-Code improprieties. Specifically, Dr. Lewis testified that she told Dr. Porcarello about the B-Code misconduct and that she had "inquired" with the USVA with "regards to seeking guidance in which way to move forward taking care of the benefits for what happened with unwarranted activities." According to Dr. Lewis, Dr. Porcarello did not respond to this information.

Morris testified that Dr. Lewis informed her that some employees were improperly placing B-Codes on other employees' accounts, including Maynard's account. Morris, however, could not recall if Dr. Lewis told her that she had shared her concerns with the TVC or USVA. Morris reported Dr. Lewis' concerns to Dr. Sterling. Dr. Sterling responded by scheduling a meeting with Morris and Baldonado. After the meeting, Dr. Sterling told Morris that she would talk to Dr.

Lewis and recommend that employees who had misused the B-Code be given a written or verbal warning. Dr. Lewis, however, wanted the employees to be terminated and she informed Morris that she was concerned about the disciplinary action the employees received and Dr. Sterling's response.

Morris also shared the information with Dr. Porcarello, who initiated an internal audit to address Dr. Lewis' concerns regarding potential misuse of the B-Code. On September 11, 2015, Belinda Brockman ("Brockman"), Director for Internal Audits, sent a memorandum to Dr. Porcarello, Dr. Bagherpour, and Zamora informing them of the results of the internal audit. The internal audit confirmed that a B-Code had been applied to Maynard's student account for the Spring 2012 and Fall 2013 semesters. The USVA, however, was never billed for the tuition and fees associated with these errors. The B-Code was removed from Maynard's student account and she was required to pay the tuition amounts due.

Morris testified that although she had discussed Dr. Lewis' allegations with Dr. Sterling, Dr. Porcarello, Anderson, and internal auditors, she did not recall telling anyone that Dr. Lewis had reported her concerns to the USVA or TVC. Anderson testified that he remembered talking to Morris about the B-Code allegations, but he was unaware that Dr. Lewis had reported her concerns to the TVC or USVA.

In addition to asserting a claim of retaliation against HCC under the Whistleblower Act, Lewis later amended her petition to assert a claim against HCC

14

for race discrimination under Chapter 21 of the Texas Labor Code and 42 U.S.C. Section 1981. HCC removed the case to federal court based on Dr. Lewis' Section 1981 claim and then filed a combined motion for summary judgment and Rule 12(b)(1) motion to dismiss arguing, among other things, that Lewis could not establish a Section 1981 claim. The federal court granted HCC's motions, dismissed Dr. Lewis' Section 1981 claim with prejudice, and remanded the Chapter 21 and Whistleblower Act claims to state court.

HCC then filed a plea to the jurisdiction, arguing the trial court lacked subject-matter jurisdiction, because Dr. Lewis could not establish numerous elements of her claims. HCC argued that Dr. Lewis (1) had not established the requisite, jurisdictional prima facie elements for her racial discrimination claim or disproved HCC's legitimate, nondiscriminatory reasons for terminating her employment or proven pretext, (2) failed to initiate HCC's administrative remedies prior to filing suit as required by the Whistleblower Act, (3) admitted during her deposition that she never made a report in good faith of any violation of law to an appropriate law enforcement authority as required by the Whistleblower Act, and (4) could not establish the requisite causal connection for her Whistleblower Act claim. After a hearing, the trial court denied HCC's plea on July 26, 2019.[8]

---

[8] HCC filed a motion objecting to some of the evidence Dr. Lewis submitted in response to HCC's plea to the jurisdiction. The trial court sustained several of HCC's objections.

15

This appeal followed.

## Standard of Review

HCC, as a public community college, is a political subdivision of the state protected by governmental immunity.[9] *See Houston Cmty. Coll. Sys. v. HV BTW, LP*, 589 S.W.3d 204, 209 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *see also* TEX. CIV. PRAC. & REM. CODE § 101.001(3)(A)–(B). Governmental immunity "deprives a trial court of jurisdiction over lawsuits in which the state or certain governmental units have been sued, unless the state consents to suit." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012); *see also Houston Cmty. Coll. Sys.*, 589 S.W.3d at 209. Both the Texas Commission on Human Rights Act ("TCHRA") and the Whistleblower Act waive a government employer's liability from suit under limited circumstances. *See Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 636–37; *State v. Lueck*, 290 S.W.3d 876, 881 (Tex. 2009); *see also* TEX. GOV'T CODE § 554.0035; TEX. LAB. CODE § 21.254. The Legislature, however, waives immunity only for those suits where the plaintiff "actually alleges a violation" of the TCHRA and the Whistleblower Act by "pleading

---

[9]     *Houston Cmty. Coll. Sys. v. HV BTW, LP*, 589 S.W.3d 204, 209 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("Governmental immunity includes both immunity from liability, which bars enforcement of a judgment against a governmental entity, and immunity from suit, which bars suit against the entity altogether.") (citing *Lubbock Cty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 300 (Tex. 2014)).

facts that state a claim thereunder." *Mission Consol. Indep. Sch. Dist.*, 372 S.W.3d at 637; *see also Lueck*, 290 S.W.3d at 881.

Immunity from suit may be asserted through a plea to the jurisdiction. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). We review a plea challenging the trial court's jurisdiction de novo. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004). When a plea to the jurisdiction challenges the existence of jurisdictional facts, such as here, we consider relevant evidence submitted by the parties. *Id.* at 227. The standard of review for a jurisdictional plea based on evidence "generally mirrors that of a summary judgment under Texas Rule of Civil Procedure 166a(c)." *Id.* at 228. Under this standard, we credit evidence favoring the nonmovant and draw all reasonable inferences in the nonmovant's favor. *See id.* The defendant must assert the absence of subject-matter jurisdiction and present proof that the trial court lacks subject-matter jurisdiction. *Id.* If the defendant discharges this burden, the plaintiff must present evidence sufficient to raise a material issue of fact regarding jurisdiction, or the plea will be sustained. *Id.*

**Race Discrimination**

HCC argues the trial court erred by denying its plea to the jurisdiction on Dr. Lewis' race discrimination claim because (1) Dr. Lewis did not bring forth direct evidence of race discrimination, (2) Dr. Lewis failed to establish a prima facie claim

17

of race discrimination through circumstantial evidence, (3) HCC presented legitimate, non-discriminatory reasons for Dr. Lewis' termination, and (4) Dr. Lewis failed to show that HCC's reasons were pretextual.

## A.    Applicable Law

The TCHRA prohibits employers from discriminating against employees "because of" race. *See* TEX. LAB. CODE § 21.051. There are two alternative methods by which a plaintiff can establish discrimination under the TCHRA. *See Clark*, 544 S.W.3d at 781–82; *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 433 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). An employee can offer direct evidence of the employer's discriminatory actions or words. *See Clark*, 544 S.W.3d at 782. Alternatively, because direct evidence of discrimination is rarely available in employment cases, courts also allow claims to proceed based on indirect or circumstantial evidence of discrimination. *See id.* (stating employees can establish prima facie case of discrimination with circumstantial evidence because "smoking guns are hard to come by"); *see also Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir. 1994) (stating "direct evidence of employment discrimination is rare"). Under this second method, Texas courts follow the burden-shifting mechanism set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802–05 (1973).

18

Under the *McDonnell Douglas* framework, if an employee establishes a prima facie case of discrimination, a rebuttable presumption of discrimination arises. *Clark*, 544 S.W.3d at 782. The employer can defeat this presumption by producing evidence of a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer rebuts the presumption, the burden shifts back to the employee to show that the employer's articulated reason for the adverse employment action is false and a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 807; *see also Clark*, 544 S.W.3d at 782. Although intermediate evidentiary burdens shift back and forth under the *McDonnell Douglas* framework, the ultimate burden of persuading the trier-of-fact that the employer intentionally discriminated against the employee always remains with the employee. *Clark*, 544 S.W.3d at 782; *Donaldson*, 495 S.W.3d at 435.

**B.    Evidence of Race Discrimination**

Dr. Lewis contends that the trial court correctly denied HCC's plea to the jurisdiction because she established a prima facie case of race discrimination by presenting direct and circumstantial evidence of discrimination.

**1.    Direct Evidence**

Dr. Lewis argues that sworn statements Dr. Parvin Bagherpour made in this case and in the complaint she filed against HCC for discrimination constitute direct

evidence of race discrimination.[10]  Specifically, Dr. Lewis directs the court to Dr. Bagherpour's allegation in her complaint that she was "forced" by her "superiors" in HCC's legal department and Human Resources Department "to terminate African American employees and escort them out of the building, thus causing HCC employees to believe that Dr. Bagherpour was responsible for terminating certain African American employees when, in fact, she was not."

During her deposition, however, Dr. Bagherpour explained that she was not alleging that any employees had been terminated because of their race.  Rather, she testified that she did not want to be involved in communicating terminations or escorting employees from the building, but that HCC nonetheless required her to do so.[11]  She further testified that no one at HCC ever told her to fire an employee

---

[10]   In December 2016, Dr. Bagherpour filed a complaint against HCC asserting claims of discrimination under Title VII of the Civil Rights Act of 1964, a claim under the Equal Pay Act, and a claim under 42. U.S.C. § 1981.

[11]   When asked at her deposition to identify the employees her superiors had forced her to terminate and escort out of the building, Dr. Bagherpour named four former employees, none of whom were Dr. Lewis.  Specifically, Dr. Bagherpour testified that two African American students who worked in her department had been terminated because of "some discrepancy with the department of homeland security," and that although she was not involved in those employment decisions, Dr. Bagherpour was instructed to escort both students out of the building.  Dr. Bagherpour also testified that her former secretary, an African American woman, was terminated because she had not shown up for work.  Dr. Bagherpour, who did not agree with the decision to terminate her employment, was instructed to escort the woman out of the building.  The last person Dr. Bagherpour identified was an African American woman in the VA Department who had placed a cross on Dr. Bagherpour's door.  Dr. Bagherpour, who agreed with the employment decision, was instructed to escort the woman from the building.  Dr. Bagherpour testified that

20

because they were African American and that she did not make any employment decisions or recommendations about Dr. Lewis because of her race.

"'Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Donaldson*, 495 S.W.3d at 433 (quoting *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 653 (Tex. App.—Dallas 2012, no pet.)). "Generally, statements that courts have found to constitute direct evidence of discrimination are insults or slurs made against a protected group." *Donaldson*, 495 S.W.3d at 433; *see also Jespersen*, 390 S.W.3d at 654.

Dr. Bagherpour's statements, if believed, do not prove that there was a "discriminatory animus" behind the decision to terminate Dr. Lewis' employment by Dr. Bagherpour or anyone else at HCC. *See Donaldson*, 495 S.W.3d at 433; *Jespersen*, 390 S.W.3d at 653. At most, the statements reflect Dr. Bagherpour's concern that by involving her in the referenced terminations, her superiors at HCC had led employees to believe she was involved in or "responsible for [the] terminat[ion] of certain African American employees when, in fact, she was not." These statements are not the type of rare evidence courts have found to constitute direct evidence of discrimination. *See Clark*, 544 S.W.3d at 782 (noting rarity of

---

she did not want to escort any of these former employees from the building, but she felt that she had no choice but to comply with these requests from human resources.

direct evidence of discrimination in employment cases; "smoking guns are hard to come by").

Accordingly, we conclude Dr. Lewis did not present evidence of direct discrimination. We will now consider whether Dr. Lewis has established a prima facie case of discrimination based on circumstantial evidence.[12]

## 2.    Circumstantial Evidence - *McDonnell Douglas* framework

To establish a prima facie case of race discrimination, Dr. Lewis must show that she (1) is a member of a protected class, (2) was qualified for her position, (3) suffered an adverse employment action, and (4) was replaced by someone outside of her protected class or others similarly situated were treated more favorably. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008); *see also Donaldson*, 495 S.W.3d at 434. HCC does not dispute that Dr. Lewis established the first three elements of her claim. Instead, HCC argues that Dr. Lewis' race discrimination claim fails because she has

---

[12]    In her written response to Lucrecia Hembree's complaint of discrimination, Dr. Lewis stated that another subordinate, Sandra Hansen, had previously referred to Dr. Lewis as a "monkey" in Spanish. Dr. Lewis does not rely on or identify this comment as direct evidence of discrimination in HCC's employment decisions concerning Dr. Lewis. The statement is alleged to have been made by a subordinate, who (1) was not involved in Dr. Lewis' disciplinary or termination decisions, (2) did not participate in any investigations concerning Dr. Lewis' conduct or job performance, and (3) lacked authority to make any disciplinary or termination recommendations. *See AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592–93 (Tex. 2008) (citing *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607–08 (5th Cir. 2007) (stating remarks may serve as evidence of discrimination if "made by an individual with authority over the employment decision")).

22

not shown that she was replaced by someone outside of her protected class or that others similarly situated to Dr. Lewis were treated more favorably.

### a) Replacement by Someone Outside the Protected Class

Dr. Lewis argues she established the fourth element of her claim because she was "initially replaced" by Dr. Bagherpour, an Iranian woman, as Director of the VA Department. The evidence does not support this purported replacement. Rather, the record reflects that in addition to maintaining her own duties as HCC's Associate Vice Chancellor of International Student Services, Dr. Bagherpour assumed Dr. Lewis' duties only temporarily from the time Dr. Lewis went on administrative leave in mid-September 2015, until HCC named Dr. Archie, an African American male, as the VA Department's interim director in mid to late October 2015. Several months later, HCC hired Dr. Grissett, who is also African American, as the VA Department's permanent director.

Thus, the undisputed evidence is that Dr. Grissett, an African American male, was Dr. Lewis' permanent replacement. That Dr. Bagherpour may have performed or assumed Dr. Lewis' duties temporarily until HCC permanently hired Dr. Grissett as Dr. Lewis' replacement is of no consequence. *See Democratic Sch. Research, Inc. v. Rock*, 608 S.W.3d 290, 310 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (holding plaintiff was not replaced by employee who temporarily assumed her duties, in addition to his own, until her former position was filled by permanent hire);

23

*Baker v. Gregg Cty.*, 33 S.W.3d 72, 81 (Tex. App.—Texarkana 2000, pet. dism'd) (stating "a terminated employee is not replaced by a person who temporarily assumes the terminated employee's job duties or a person who only takes over a part of those duties"). We conclude Dr. Lewis failed to demonstrate she was replaced by someone outside of her protected class.

### b) Similarly Situated Employees

Dr. Lewis argues that she also satisfied the fourth element of her claim because she established that HCC treated other similarly situated employees more favorably. "Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 312 (Tex. 2020) (citing *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005)). Although their circumstances need not be "identical," the situations and conduct of the employees in question must be "nearly identical" for them to be similarly situated. *Flores*, 612 S.W.3d at 312; *Reyes*, 272 S.W.3d at 594. "Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *Flores*, 612 S.W.3d at 312 (quoting *Reyes*, 272 S.W.3d at 594). Further, to establish that employees are "comparable in all material respects," a plaintiff "must produce evidence that the plaintiff and comparator . . . engaged in the same conduct without such

24

differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019). Because they hold different jobs and have different work responsibilities, subordinate and superior employees generally are not considered to be similarly situated. *See Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 585 (Tex. 2017) (holding higher-ranking employees were not similarly situated to plaintiff); *see also Grimes v. Wal–Mart Stores Tex., L.L.C.*, 505 Fed. Appx. 376, 379 (5th Cir. 2013) (concluding plaintiff's subordinate, who was also manager, was not valid comparator); *Crosby v. Comput. Sci. Corp.*, 470 Fed. Appx. 307, 309 (5th Cir. 2012) (concluding plaintiff's supervisor was not valid comparator).

Dr. Lewis offers the following individuals as comparators: Dr. Bagherpour, Charles Smith (Caucasian), Thomas Anderson (Caucasian), Raymond Bell (Caucasian), Rogelio Anasagasti,[13] and Maynard (Caucasian). At the outset, we address Dr. Lewis' argument that all these employees are similarly situated to her, because as she contends, Dr. Maldonado is the ultimate decisionmaker for all "for cause" terminations of full-time employees.

In his role as HCC's Chancellor, Dr. Maldonado does not personally handle every allegation of wrongdoing, including allegations of discrimination. Rather, Dr.

---

[13]     The record reflects Anasagasti's ethnicity (Hispanic), but neither the record nor Dr. Lewis identify his race.

25

Maldonado relies upon the HR Department and others who report to him to handle such matters. According to Anderson, Dr. Maldonado does not become involved in the employment decision-making process unless there is a recommendation that an employee be terminated for cause. Dr. Maldonado does not participate in any other disciplinary actions.

Contrary to Dr. Lewis' allegations, the record here does not reflect that any of her proffered comparators were recommended for termination "for cause" and therefore, that Dr. Maldonado was involved in any of their employment decisions. Moreover, Dr. Maldonado testified that he did not recall being asked to approve the termination of any other director at HCC, except for Dr. Lewis. Therefore, there is no evidence that Dr. Maldonado was the ultimate decisionmaker with respect to the employment decisions for any of the proposed comparators or any other director at HCC.

Even if Dr. Maldonado had been the "ultimate decisionmaker" with respect to the employment decisions identified by Dr. Lewis, this factor would not change the outcome of our analysis. As discussed below, the differences between Dr. Lewis and the identified employees are such that none of these individuals can be considered valid comparators. Dr. Lewis and her comparators had different supervisors, titles, roles, responsibilities, and in some cases, worked in different departments. *See Monarrez*, 177 S.W.3d at 917 (stating similarly situated

26

employees must be "comparable in all material respects, including similar standards, supervisors, and conduct"); *see also Flores*, 612 S.W.3d at 312 (holding there was no evidence supporting's plaintiff argument that she was similarly situated to subordinate even though both women reported to university president and president was ultimate decision maker with respect to their employment decisions).

### (1) Dr. Bagherpour

Dr. Lewis argues that Dr. Bagherpour is similarly situated to her because (1) they were both employed as the Director of the VA Department, (2) they shared the same supervisor, (3) Dr. Maldonado was the ultimate decision-maker with respect to their employment, and (4) Dr. Bagherpour's employment was not terminated, even though multiple claims of discrimination had been lodged against her.

Dr. Bagherpour was HCC's Associate Vice Chancellor of International Student Services, not the Director of the VA Department; she did, however, temporarily perform Dr. Lewis' duties, in addition to her own responsibilities, until Dr. Archie was hired as the interim Director of the VA Department in October 2015.

Dr. Bagherpour reported directly to Dr. Porcarello from March 2015 to September 2015.[14] As the Director of the VA Department, Dr. Lewis initially

---

[14]  Dr. Porcarello, who replaced Dr. Diana Pino, was hired as the interim Vice Chancellor of Student Services in March 2015. Dr. Kim Beatty was serving as both the Vice Chancellor of Instructional Services/Chief Academic Officer and the interim Vice Chancellor of Student Services as of October 5, 2015. Dr. Philip

reported to Dr. Sterling and then later to Dr. Bagherpour. *See Crosby*, 470 Fed. Appx. at 309 (concluding plaintiff's supervisor was not valid comparator). Unlike Dr. Bagherpour, Dr. Lewis did not report directly to Dr. Porcarello.

Although Dr. Lewis contends that Dr. Bagherpour had multiple complaints lodged against her, the record reflects that the only formal complaint of discrimination was filed by Dr. Archie in January 2016. Specifically, Dr. Archie alleged that one of HCC's internal auditors told him in December 2015, that Dr. Bagherpour had told her, among other things, that Dr. Archie had only been hired as the VA Department's interim director because he was African American. Dr. Archie informed Philip Nicotera, then the interim Vice Chancellor of Student Services and Dr. Bagherpour's supervisor, of the comments and asked for a meeting. Dr. Nicotera, Dr. Archie, and Dr. Bagherpour met a few days later. Dr. Archie's discrimination claim against Dr. Bagherpour was also investigated externally. The internal auditor denied telling Dr. Archie that Dr. Bagherpour had stated Dr. Archie had been hired only because he was African American.

In February or March 2016, Dr. Archie filed a second complaint against Dr. Bagherpour alleging Dr. Bagherpour had retaliated against him by making decisions and changes regarding the VA Department without informing him and expressly

Nicotera apparently replaced Dr. Beatty, as the interim Vice Chancellor of Student Services later that year and became Dr. Bagherpour's supervisor.

28

directing VA staff not to inform him of the changes. This complaint was investigated and found to be true. Dr. Archie testified that he did not know what discipline, if any, Dr. Bagherpour incurred because she was on leave when the findings were made.

Thus, the record reflects that Dr. Bagherpour's and Dr. Lewis' circumstances are not comparable in all material aspects. Dr. Nicotera, who never supervised Dr. Lewis, was Dr. Bagherpour's supervisor when Dr. Archie filed his race and retaliation claims against Dr. Bagherpour. Furthermore, unlike Dr. Lewis, no finding was made that Dr. Bagherpour discriminated against Dr. Archie or anyone else. The only allegation against Dr. Bagherpour that was found to be true was Dr. Archie's retaliation claim, but the record does not reflect whether Dr. Bagherpour was disciplined as a result.

Dr. Lewis' reliance upon anonymous email messages sent to various HCC administrators and staff on September 18, 2013, and in January 2014, alleging Dr. Bagherpour had discriminated against African American employees in the International Student Services department based on their race also falls short. Unlike Hembree's complaint against Dr. Lewis, which resulted in a finding of discrimination, the email complaints against Dr. Bagherpour were not investigated

because they were made anonymously.[15] The allegations also concerned alleged discrimination in a department different than the one where Dr. Lewis worked, and as noted, Dr. Bagherpour and Dr. Lewis did not report to the same supervisor.

Given the differences between Dr. Lewis' and Dr. Bagherpour's circumstances, Dr. Bagherpour cannot be considered a valid comparator. *See Monarrez*, 177 S.W.3d at 917 (stating similarly situated employees must be "comparable in all material respects, including similar standards, supervisors, and conduct") (citation omitted).

### (2) Smith, Anderson, Bell, and Anasagasti

Dr. Lewis argues that Smith, Anderson, Bell, and Anasagasti are also similarly situated to her. However, the record reflects that Smith, Anderson, Bell, and Anasagasti did not hold the same position, work in the same department, have the same work responsibilities or have the same supervisor as Dr. Lewis. As such, they cannot be valid comparators. *Flores*, 612 S.W.3d at 312 (quoting *Reyes*, 272 S.W.3d at 594) (noting that employees with different responsibilities, supervisors, and capabilities are not considered to be nearly identical)

Beyond these deficiencies, there is also insufficient evidence to establish the requisite "similarity" in job performance or conduct necessary to establish a valid

---

[15] While Dr. Lewis disagrees with this ultimate finding, she does not dispute that a formal complaint of discrimination was filed against her, resulting in a formal investigation and a corresponding finding of discrimination.

comparator. There is no specific evidence regarding the referenced employees' job performance or work history, and, unlike Dr. Lewis, there is no evidence that any of them had received a PIP. Nevertheless, Dr. Lewis contends that these four males are similarly situated to her because they all had one or more allegations of race discrimination lodged against them and HCC did not terminate their employment.

### (a) Smith

Dr. Lewis argues that Smith, the former Executive Director of Facilities at HCC, and not an employee at the VA Department, is similarly situated to her because his employment was not terminated despite having had two claims of discrimination filed against him by subordinate African American employees. One complaint was filed by an African American man who alleged that Smith had discriminated against him and others based on race. The record, however, only reflects a general allegation of wrongdoing concerning Smith's alleged mistreatment of African American employees. There is no evidence regarding the specific conduct Smith allegedly engaged in that prompted the discrimination claim, and therefore, no way to evaluate whether he and Dr. Lewis engaged in the same behavior.[16] *See Harris Cty. v. Bankhead*, No. 01-13-01005-CV, 2014 WL 7474097, at *5 (Tex. App.—Houston

---

[16] The complaint is not included in the record, and there is no evidence as to when the claim was filed. The record reflects that the complaint was investigated externally, but there is no evidence reflecting the outcome of the investigation or any resulting recommendations. Anderson, who testified he was unaware of any claims filed against Smith, testified that Smith had resigned and is no longer employed by HCC.

[1st Dist.] Dec. 30, 2014, pet. denied) (mem. op.) ("[T]he most critical factor in evaluating comparator evidence is that the plaintiff's conduct that drew the adverse employment action be 'nearly identical to that of the proffered comparator who allegedly drew' a dissimilar response.") (quoting *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)); *see also Haynes*, 922 F.3d at 223–24 ("[T]o establish a valid comparator, the plaintiff must produce evidence that the plaintiff and comparator. . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." (internal quotation marks omitted)).

Unlike with Dr. Lewis, there is also no evidence that the allegation of discrimination was found to be true. Although there is testimony that the male employee's discrimination claim against Smith also included a general complaint about Smith's job performance and his interactions with subordinates, there is nothing in the record reflecting that Smith was ever given a PIP or otherwise previously disciplined for his work. There is also no specific evidence reflecting the factual basis for the employee's complaint about Smith's job performance. The other complaint against Smith, which was filed by an African American woman, has even less in common with Dr. Lewis' situation because that employee alleged that Smith had made inappropriate comments of a sexual nature. There is no evidence in the record, however, concerning the claim, whether it was investigated, and what,

if any, resulting recommendations were made, and therefore, there is insufficient evidence to establish the potential similarity in circumstances necessary for a comparator analysis.

### (b) Anderson

Dr. Lewis contends that Anderson, HCC's Director of Employee Relations, is also similarly situated to her because he had at least four claims of discrimination filed against him and he was never placed on administrative leave, interviewed, or recommended for termination. Three of the four allegations of discrimination were raised in 2012, 2013, and 2018, and are, therefore, too remote in time to be probative of whether race was a factor in Dr. Lewis' termination in 2015. *See Buckhanan v. Shinseki*, 665 Fed. Appx. 343, 350 (5th Cir. 2016) (holding employment decision made more than two years before plaintiff's employment decision was too remote to consider employee similarly situated); *see also Lee*, 574 F.3d at 259 ("Employees . . . who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated." (citation omitted)); *see also Arceneaux v. Metro. Life Ins. Co.*, 481 Fed. Appx. 196, 198–99 (5th Cir. 2012) (holding plaintiff and other employees were not similarly situated because incidents occurred two to three years apart and change in supervisor occurred during that time). The only discrimination claim with a temporal proximity to the allegation against Dr. Lewis is the 2015 complaint, and like the 2012, 2013,

33

and 2018 complaints, OIE closed the case after the complainant decided not to pursue the matter. Thus, unlike Dr. Lewis, there is no finding that Anderson ever engaged in discriminatory conduct.

### (c) Bell

Dr. Lewis also argues that Bell, who was employed by HCC as a supervisor in Asset Management (not in the VA Department), is similarly situated to her because he was not disciplined after having a loud argument with an African American subordinate who also raised complaints against him. The record reflects that Bell and the African American subordinate were involved in "a heated exchange," during which they both raised their voices. Unlike Dr. Lewis and Maynard, there is no evidence that anyone witnessed the argument between Bell and the employee, or that the situation escalated to the point where either participant felt threatened or otherwise felt the need to involve campus police. Furthermore, unlike Dr. Lewis, Bell immediately sought HR's assistance to resolve the dispute. After hearing from both sides, Morris recommended that the employee be given an opportunity to be retrained for her position and that Bell set performance expectations for the employee. No further steps were taken. According to Morris, HR did not investigate the situation between Smith and the employee "[b]ecause that was an informal matter that was handled when they brought it up to—when they came to HR, we handled that situation with a discussion."

The same employee had also filed a complaint against Bell and nine other HCC employees in 2016, including allegations that Bell had "blocked her path with a printer tray" and that another employee was "coercing her supervisor [Bell] to harass and intimidate her." She did not make any specific claims of discrimination against Bell. OIE investigated her complaints and determined that "the facts gathered do not support a violation of HCC Policy G.1; Discrimination and Harassment." Thus, unlike Dr. Lewis, there was no finding that Bell discriminated against a subordinate.

### (d) Anasagasti

Dr. Lewis also argues that Rogelio Anasagasti, who was employed as the Executive Director of Purchasing (outside the VA Department), is similarly situated to her because he had a complaint raised against him by an African American employee. The record reflects that one of Anasagasti's African American employees filed a complaint against him, but there is no evidence of when the complaint was filed, the outcome of the investigation or specific information regarding the conduct that led to the filing of the complaint. Morris testified that she did not know the specifics of the complaint, which was filed before she worked for HCC. When asked what she understood the nature of the complaint to be, Morris testified, "[m]y understanding is that the complaint was against the way the employee was treated." Thus, there is no evidence that Anasagasti's underlying conduct was the same as Dr.

Lewis' conduct or whether the alleged misconduct occurred close enough in time to be probative of whether race was a factor in Dr. Lewis' termination. *See Buckhanan*, 665 Fed. Appx. at 350 (holding employment decision made more than two years before plaintiff's employment decision was too remote to consider employee similarly situated).

Because the differences between Dr. Lewis and Smith, Anderson, Bell, and Anasagasti significantly outweigh the similarities between them, none of these individuals are valid comparators. *See Monarrez*, 177 S.W.3d at 917 (stating similarly situated employees must be "comparable in all material respects, including similar standards, supervisors, and conduct") (citation omitted).

### (3) Maynard

Dr. Lewis' argument that Maynard is similarly situated to her is also unavailing. Maynard, a Caucasian woman, was employed as a Student Services Assistant in the VA Department. She had been hired by Dr. Lewis and reported to her directly. Whereas Dr. Lewis was responsible for, among other things, providing effective oversight and leadership within the VA Department and supervising the department's dozens of employees, including Maynard, Maynard's job required her to perform various clerical and administrative duties, including answering the phones in the department's call center. *See Flores*, 612 S.W.3d at 312 (holding plaintiff's subordinate was not valid comparator); *see also Grimes*, 505 Fed. Appx.

at 379 (same).  Although both Dr. Lewis and Maynard had a history of poor job performance, Maynard was never found to have engaged in poor leadership and management practices like Dr. Lewis.  Maynard and Dr. Lewis did not share the same supervisor and there is no evidence that anyone had ever filed a complaint against Maynard for discrimination.  Further, Maynard was reprimanded for her unprofessional behavior and given a thirty-day PIP in response to the September 15, 2015 incident.  Under these circumstances, Maynard is not similarly situated to Dr. Lewis.  *See Flores*, 612 S.W.3d at 312; *see also Grimes*, 505 Fed. Appx. at 379.

We conclude that Dr. Lewis has not established that HCC treated other similarly situated employees more favorably.  Accordingly, we hold that Dr. Lewis did not establish a prima facie case of racial discrimination and therefore, the trial court erred by denying HCC's plea to the jurisdiction on her race discrimination claim.[17]

**Texas Whistleblower Act**

HCC argues that the trial court erred in denying its plea to the jurisdiction as to Dr. Lewis' Whistleblower Act claim because Dr. Lewis failed to (1) initiate her

---

[17]    Because Dr. Lewis failed to establish a prima facie case of racial discrimination, we need not determine whether HCC established a legitimate, nondiscriminatory reason for terminating Dr. Lewis, and if so, whether Dr. Lewis overcame HCC's legitimate non-discriminatory reason by establishing that HCC's stated reasons for her termination were a mere pretext.  *See Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 312 (Tex. 2020).

administrative remedies as required by the Whistleblower Act, (2) report a violation of law, in good faith, to a law enforcement authority, and (3) establish the causation element of her claim.

## A.    Applicable Law

The Whistleblower Act prohibits a government employer from taking an adverse personnel action against a public employee who in good faith reports a violation of law to an appropriate law-enforcement authority. *See* TEX. GOV'T CODE § 554.002(a); *Office of Att'y Gen. v. Rodriguez*, 605 S.W.3d 183, 191 (Tex. 2020). The Act, however, "does not afford unlimited protection from adverse personnel actions based on legitimate reasons." *See Rodriguez*, 605 S.W.3d at 192. Employers have the right to make employment decisions based on conduct that arises after an employee reports a legal violation. *Id.* at 192, 196. The Act also preserves an employer's right to terminate an employee "when it has 'sufficient sound reasons' or even 'harbor[s] bad motives never acted upon.'" *Id.* at 192 (quoting *Tex. Dep't of Human Servs. v. Hinds*, 904 S.W.2d 629, 635–36 (Tex. 1995) (alteration in original).

To establish a claim under the Whistleblower Act, an employee must establish that the employer took an adverse employment action because the employee made a report in good faith. *See Rodriguez*, 605 S.W.3d at 192; *Hinds*, 904 S.W.2d at 633. The employee need not establish that her report was the sole or substantial reason

38

for the employer's adverse action. *Rodriguez*, 605 S.W.3d at 192. Instead, she must present some evidence that "but for" her report, the adverse employment action would not have occurred when it did. *Id.* ("An adverse employment action 'based solely' on reasons unrelated to a good-faith report of a legal violation destroys the causal link."); *see also City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 68 (Tex. 2000).

While circumstantial evidence may be sufficient to establish the requisite causal link, such evidence must, at a minimum, show that the person who took the adverse employment action knew of the employee's report. *Harris Cty. v. Vernagallo*, 181 S.W.3d 17, 25 (Tex. App.—Houston [14th Dist.] 2005, pet. denied); *see also Zimlich*, 29 S.W.3d at 70. Stated differently, a "decision-maker could not fire an employee because of the employee's report of alleged illegal conduct if the decision-maker did not even know the employee made such a report." *Alief Indep. Sch. Dist. v. Perry*, 440 S.W.3d 228, 238 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

In *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 69 (Tex. 2000), the Texas Supreme Court explained that in evaluating circumstantial evidence of causation in Whistleblower Act cases, a court must examine all of the circumstances, including knowledge of the report of illegal conduct, the temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to

adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false. *See id.*; *see also Clark*, 544 S.W.3d at 790 (stating relevant circumstances include "the temporal proximity between the protected activity and the adverse action") (citing *Zimlich*, 29 S.W.3d at 69)).

## B. Analysis

HCC argues that the trial court erred in denying its plea to the jurisdiction with respect to Dr. Lewis' Whistleblower Act claim because, among other things, Dr. Lewis cannot establish that her employment would not have been terminated but for her reports to the TVC and USVA. We address each of the *Zimlich* factors below.

### 1. Knowledge of Decision-Maker

HCC argues that Dr. Lewis' retaliation claim fails because Dr. Maldonado, the final decision-maker, did not know that Dr. Lewis had reported her concerns to the TVC and USVA when he approved Anderson's recommendation to terminate her employment in October 2015. Dr. Lewis claims Dr. Maldonado was aware of her whistleblowing activities because her attorney emailed Dr. Maldonado several documents in September 2015, including Dr. Lewis' rebuttal to Maynard's complaint, which detailed her discovery of Maynard's improper use of the B-Code.

In her rebuttal, Dr. Lewis stated that, in December 2014, she learned that a Veteran's Award had been placed on Maynard's student account in 2012 and 2013,

and that she "informed various persons at Houston Community College what [she had] discovered including: the Associate Vice Chancellor of Student Services, Human Resources and internal auditors."  Notably, Dr. Lewis does not state that she informed such persons of her reports to the TVC, the USVA, or anyone else outside of HCC.  Therefore, Dr. Lewis' response is not evidence that Dr. Maldonado knew that Dr. Lewis had made reports to the TVC or USVA before he approved the recommendation to terminate her employment.  Indeed, Dr. Maldonado averred in his affidavit that he did not know that "Dr. Lewis had made any reports to the Texas Veterans Commission or the U.S. Department of Veterans Affairs in late 2014 and early 2015, and therefore I could not, and did not, approve the termination of her employment because she made these reports."

Dr. Lewis also argues that even if Dr. Maldonado was unaware of her reports, she can still establish but-for causation using the "cat's paw" or "conduit" theory of liability.  She argues that there is some circumstantial evidence that supports the inference that Dr. Maldonado "was unduly influenced by the discriminatory animus of the true decision-maker e.g., Anderson and Porcarello."

Under the "cat's paw" or "conduit" theory of liability, a plaintiff can establish an employer's liability where another employee with retaliatory animus influenced the actual decision maker to take retaliatory action against the plaintiff.  *See Zamora v. City of Houston*, 798 F.3d 326, 332–33 (5th Cir. 2015) (applying "cat's paw" or

41

"conduit" theory to Title VII discrimination claim). "Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action." *Id.* at 331.

It is uncertain whether the "conduit" or "cat's paw" theory of liability is applicable to Whistleblower Act retaliation claims. *Cf. Zimlich*, 29 S.W.3d at 70 (declining to consider whether liability under the Whistleblower Act can be based on a "conduit" causation theory); *Vernagallo*, 181 S.W.3d at 26 n.15 (declining to apply "conduit" theory to Whistleblower Act claim because Texas Supreme Court has not adopted theory). But even if it were, Dr. Lewis does not offer any evidence that anyone involved in the decision-making process, including Anderson and Dr. Porcarello, expressed a negative attitude toward Dr. Lewis' alleged whistleblowing activity or harbored a retaliatory animus toward her and recommended her termination because of her reports.

Notably, there is no evidence that Anderson, who recommended to Dr. Maldonado that Dr. Lewis' employment be terminated, knew about the purported reports to the TVC or USVA when he made the recommendation. While Dr. Lewis claims that Morris told Anderson about Dr. Lewis' "whistleblowing" report, the record reflects that Morris informed Anderson only of Dr. Lewis' internal reports at HCC. Specifically, Morris testified that after Dr. Lewis informed her about the B-Code misconduct, she shared the information with Anderson. When asked directly

42

about Dr. Lewis' reports to the TVC or USVA, however, Morris, testified she could not recall if Dr. Lewis had told her she had reported her concerns to the USVA or TVC, or if she had shared this information with Anderson. In his deposition, Anderson confirmed he had spoken to Morris about the alleged B-Code misuse, but he denied knowing Dr. Lewis had reported her concerns to the TVC or USVA.

At most, there is some evidence that Dr. Porcarello knew in April 2015 that Dr. Lewis had contacted the USVA regarding her concerns that HCC's VA Department employees had been misusing the B-Code. There is no evidence, however, that Dr. Porcarello expressed a negative attitude toward Dr. Lewis' reports to the USVA at that time or that she took Dr. Lewis' reporting into consideration six months later, when she instructed Dr. Bagherpour to recommend Dr. Lewis' termination.[18] And even if there were evidence of "negative attitude" harbored by Dr. Porcarello, there is no evidence that such negative attitude influenced Dr. Bagherpour or Morris, both of whom recommended Dr. Lewis' termination to Anderson, who in turn, recommended Dr. Lewis' termination to Dr. Maldonado. This is fatal to Dr. Lewis' claim. "Evidence must show that the retaliatory motive was shared by the necessary decisionmakers and reflected in the final decision." *Rodriguez*, 605 S.W.3d at 196. There is no such evidence here.

---

[18] The record reflects that Dr. Porcarello in fact initiated an internal audit to address Dr. Lewis' concerns regarding the alleged misuse of the B-Code.

43

Although Anderson reviewed Dr. Bagherpour's and Morris' separate reports and recommendations, the record reflects that he also conducted an independent review of the information they provided and that based on his independent review, Anderson determined Dr. Lewis' "performance problems were significant, constituted serious violations of HCC policy, and warranted the termination of her employment from HCC."[19]

## 2. Temporal Proximity

Dr. Lewis argues that other circumstantial evidence demonstrates her employment would not have been terminated, but for her reports, including the temporal proximity between the time she reported the B-Code violations and her suspension and termination. Temporal proximity is relevant to causation when it is "very close." *Clark*, 544 S.W.3d at 790 (citation omitted).

Although Dr. Lewis reported her concerns about the B-Code to TVC and USVA in December 2014 or January 2015, Dr. Lewis contends that there is no more than a two-month time gap between the time she engaged in her protected whistleblowing activity and the time HCC placed her on administrative leave in September 2015 and terminated her employment in October 2015. Dr. Lewis argues

---

[19] Anderson recommended Dr. Lewis' termination to Dr. Maldonado in a written memorandum dated September 24, 2015. The next day, he received a copy of Dr. Lewis' rebuttal to Maynard's complaint in which Dr. Lewis discussed the B-Code misconduct. The rebuttal, however, did not disclose Dr. Lewis' reports to the TVC or USVA.

she was "advocating for justice to anybody who would listen well into the Summer of 2015[,]" and claims that the "fraudulent behavior scandal continued to be a thorn in HCC's side right up to an August 28, 2015 audit[.]" Dr. Lewis' argument is unavailing.

The Whistleblower Act protects reports of violations of the law to appropriate law enforcement authorities; its protections do not extend to internal reports. *See* TEX. GOV'T CODE § 554.002(a) (stating Whistleblower Act requires that public employee report alleged violation to "appropriate law enforcement authority"); *see generally Univ. of Tex. Sw. Med. Ctr. at Dallas v. Gentilello*, 398 S.W.3d 680, 687 (Tex. 2013) (stating "lodging an internal complaint to an authority whom one understands to be only charged with internal compliance, even including investigating and punishing noncompliance, is jurisdictionally insufficient under the Whistleblower Act"); *Tex. A & M Univ.–Kingsville v. Moreno*, 399 S.W.3d 128, 130 (Tex. 2013) (per curiam) (holding evidence state employee reported alleged violation of law to authority that only oversaw internal university compliance was jurisdictionally insufficient under Whistleblower Act). Therefore, the relevant temporal period for purposes of our causation analysis is between Dr. Lewis' reports to the USVA and TVC in late 2014 and early 2015 and her suspension and termination in September and October 2015. Because the record reflects that there is at least an eight-month gap separating these relevant events, we conclude that the

45

temporal proximity between Dr. Lewis' reports and her adverse employment action "is so long to be of little, if any, probative value" to establish causation. *Id.* at 790 (holding that eight-month gap between whistleblower's report and adverse employment action "is so long as to be of little, if any, probative value"); *see also Democratic Sch. Research, Inc.*, 608 S.W.3d at 314 (holding four-month lapse between employee's protected activity and subsequent termination, without more, did not raise fact issue regarding causal link).

### 3. Other *Zimlich* Factors

The remaining *Zimlich* factors are also unavailing. Dr. Lewis argues that "HCC does not follow its own policies, procedures, and precedent when disciplining staff," and inconsistently applies "corrective action including termination." Dr. Lewis does not identify which policies, procedures, and precedent HCC did not follow in her case. Although she points to HCC's decision to discipline, rather than terminate, Maynard after the incident in September 2015 as an example of HCC's inconsistent "application of corrective action," there are differentiating circumstances warranting the use of different disciplinary measures. Dr. Lewis was the Director of the VA Department and in her role, she was responsible for leading the department, as well as training and developing her staff, including Maynard. Given her role as the leader of the VA Department, it was not unreasonable for HCC to hold Dr. Lewis to a higher standard and discipline her more severely. Moreover,

46

as previously discussed, Dr. Lewis and Maynard were not similarly situated, and thus, Dr. Lewis has not produced evidence of discriminatory treatment compared to similarly situated employees.

Dr. Lewis also argues that "but for" causation can be inferred from the fact that HCC's stated reasons for terminating her employment are false. Dr. Lewis argues that she should not have been disciplined for calling campus police to remove Maynard from the building when Morris and Dr. Bagherpour had called the police on other occasions, or for following HR's advice that she could implement an English-only workplace rule in the VA Department. She further contends that HCC's decisions to terminate her employment based on poor performance and unprofessional conduct are false because she offered evidence of her excellent job performance, including improvements she had made within the VA Department. Dr. Lewis also contends that Anderson's and Dr. Porcarello's recommendation that she be terminated, rather than removed from her position as Morris and Dr. Bagherpour had recommended, is further evidence that HCC's reasons for termination were false.

Dr. Lewis' pretext argument is insufficient to establish causation. Without evidence that a decisionmaker knew about the protected report, the decisionmaker's "stated reasons could not be pretextual." *Rodriguez*, 605 S.W.3d at 197. Moreover, the record reflects that Dr. Lewis was not terminated because she called the campus

47

police during her argument with Maynard. Rather, Dr. Lewis' decision to call the police during that altercation was provided as an example of her poor judgment and behavioral issues that contributed to her eventual termination. Morris explained that Dr. Lewis' exercised poor judgment in calling the campus police and asking them to remove Maynard from the building because Maynard had not threatened Dr. Lewis or another employee, was not the initial aggressor, and she should have contacted HR because Dr. Lewis was "was aware of the performance and personal situations" with Maynard and HR had been working to address those issues. Morris also faulted Dr. Lewis for issuing Maynard a PIP without first discussing the matter with HR, in violation of HCC's progressive disciplinary policy. Morris also testified that her recommendation to remove Dr. Lewis as director was not based on a single event, such as calling the police or Hembree's discrimination complaint, but rather the cumulative effect of these events.

Dr. Lewis' challenges to or disagreement with the accuracy of HCC's assertion that she was terminated based on her performance are also unavailing because "[t]he ultimate question for the court 'is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive.'" *Jespersen*, 390 S.W.3d at 657 (quoting *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)).

48

Analyzing the *Zimlich* factors we conclude that Dr. Lewis has not raised a genuine fact issue on the element of causation. *See Rodriguez*, 605 S.W.3d at 198 (rendering judgment in favor of state employer on Whistleblower Act claim because there was no evidence that whistleblowing activity was but-for cause of employee's termination); *see also Miranda*, 133 S.W.3d at 228 (stating that if defendant presents proof that trial court lacks subject-matter jurisdiction, plaintiff must present evidence sufficient to raise material issue of fact regarding jurisdiction, or the plea will be sustained). Accordingly, the trial court erred in denying HCC's plea to the jurisdiction on Dr. Lewis' retaliation claim.[20]

## Conclusion

We reverse the trial court's order denying HCC's plea to the jurisdiction and render judgment dismissing Dr. Lewis' claims against HCC for lack of jurisdiction.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Radack and Justices Kelly and Rivas-Molloy.

---

[20] Because we conclude Dr. Lewis did not raise a genuine fact issue on the element of causation, we need not address whether she established the other elements of her Whistleblower Act claim, including whether she reported a violation of law or whether, as HCC contends, she failed to exhaust her administrative remedies.

49